# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

## CIVIL NO.  1:08CV31

MELISSA P. HAWKINS,      )
                      )
         **Plaintiff,**    )
                      )
        **Vs.**       )    **MEMORANDUM**
_____)     **AND ORDER**
MICHAEL J. ASTRUE, Commissioner )
of Social Security Administration,   )
                      )
       **Defendant.**  )
_____)

     **THIS MATTER** is before the Court on the parties' cross motions for summary judgment.  For the reasons stated herein, the Plaintiff's motion is granted and the Defendant's motion is denied.

## I.  STANDARD OF REVIEW

     This Court does not conduct a *de novo* review of the decision of the Administrative Law Judge (ALJ).  In fact, under the statutory scheme of the Social Security Act, the reviewing court "must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." ***Craig v.***

***Chater***, **76 F.3d 585, 589 (4ᵗʰ Cir. 1996); 42 U.S.C. § 405(g) (1988).**

Substantial evidence is defined as that which "a reasonable mind might accept as adequate to support a conclusion." ***Id.*** "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." ***Id.***; ***Shively v. Heckler*, 739 F.2d 987, 989 (4ᵗʰ Cir. 1984).** If there is sufficient evidence to withstand a motion for a directed verdict had the case been before a jury, then the evidence is substantial and the ALJ's decision may not be overturned. ***Id.*** "It is not our place either to weigh the evidence or to substitute our judgment for that of the Secretary if that decision was supported by substantial evidence." ***Hunter v. Sullivan*, 993 F.2d 31, 34 (4ᵗʰ Cir. 1992) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990)).** Thus, the issue for resolution here "is not whether [Plaintiff] is disabled, but whether the ALJ's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." ***Craig, supra.***

Each party has moved for summary judgment, claiming they are entitled to judgment as a matter of law. Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. **Fed. R. Civ. P. 56(c).** A genuine

issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. ***Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).**

Where the parties have cross-moved for summary judgment, the Court will consider each motion separately. Thus, in considering the Plaintiff's motion, Plaintiff as the moving party has an initial burden to show a lack of evidence to support Defendant's case. ***Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).** If this showing is made, the burden then shifts to the Defendant who must convince the Court that a triable issue does exist. ***Id.*** Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]." ***Id.*** A "mere scintilla of evidence" is not sufficient to defeat summary judgment. ***Id.*** After consideration of the Plaintiff's motion, the same procedure is used in connection with Defendant's motion for summary judgment.

Thus, in considering the facts of the case for purposes of these cross-motions, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. ***Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).**

In order to receive disability insurance benefits, Plaintiff must show that she was disabled at any time between May 7, 2004, the alleged onset date of disability, and March 31, 2007, the date on which she last met the insured status under the Social Security Act. ***Kasey v. Sullivan*, 3 F.3d 75, 77 n.3 (4th Cir. 1993); 42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.131; *Wilkins v. Secretary*, 925 F.2d 769, 771 n.2 (4th Cir. 1991); *Fagg v. Chater*, 106 F.3d 390 (table), 1997 WL 39146 \*1 (4th Cir. 1997).** Moreover, the fact that a condition which had its onset prior to that date later rendered Plaintiff disabled is not sufficient to warrant an award of benefits. ***Roberts v. Schweiker*, 667 F.2d 1143, 1144 (4th Cir. 1981).**

## II. PROCEDURAL HISTORY

The Plaintiff filed an initial application for disability insurance benefits alleging disability commencing on May 7, 2004; this claim was denied initially and upon reconsideration. **Plaintiff's Memorandum in Support of Motion for Summary Judgment, filed August 8, 2008, at 2.** She timely filed a request for a hearing before an ALJ and such hearing was held on July 19, 2007. ***Id.*** The ALJ issued an unfavorable decision on August 25, 2007, and the Plaintiff requested Appeals Council review. ***Id.*** The Appeals

Council rejected her request for review on January 14, 2008. *Id*. On

January 31, 2008, the Plaintiff filed this action. Following the Defendant's

answer and the filing of the administrative record on May 6, 2008, the

parties filed their respective motions for summary judgment on August 8,

2008, and October 2, 2008.

### III. FINDINGS OF FACT

**A.     Hearing testimony**

Plaintiff testified at the hearing that she was born February 27, 1967,

and at that time she testified she was 5'4" tall and weighed 308 pounds.

**Transcript of Proceedings ("Tr."), filed May 6, 2008, at 403.** She

testified that she had gained as much as 50 pounds in the past year as a

result, in part, of a lack of exercise (due to her poor physical condition) and

her medication Prednisone had caused some of the weight gain as well.

*Id*. She testified that she graduated from high school and has two years of

college. *Id.*

She stated that she last worked for the Daily Courier newspaper;

however, she had to quit the job after six months because she was

physically unable to lift the bundles of newspapers and delivering the

papers from her car caused her to have back, leg and arm pain. *Id*. at
**405, 409.** Before the job with the newspaper, the Plaintiff testified she
worked in the textile industry for about 15 years as a warp attender. *Id*. at
**410.** This job required that she sit for as much as 5 hours and stand for 7
hours during a 12-hour shift and lift as much as 10 pounds. *Id*. at 412.

She testified that she has lupus which causes her constant pain in all
her joints as well as her back; she also has a herniated disc in her back
which at times limits her ability to reach above her head and causes
significant pain with prolonged sitting or walking. *Id*. at 413-14. She
suffers from headaches and dizzy spells; she also testified that she suffers
from heel spurs in both feet that cause severe pain. *Id*. at 415. She also
testified that she has had open heart surgery and still suffers from
shortness of breath which she attributed to "pleurisy." *Id*. at 417-18. She
further testified that she suffers from urinary incontinence which causes her
to go to the bathroom on an hourly basis and interrupts her sleep at night.
*Id*. at 420.

Plaintiff testified that although she does drive a car, she cannot do so
for a long period of time because she has difficulty sitting longer than one
hour at a time; she can only stand for a few minutes; she can lift only as

much weight as a gallon container of water; she can walk only about 10 feet unassisted and only 25 feet with a cane; she has difficulty grasping objects; she has difficulty getting dressed and taking care of her personal needs; and she has to use a wheelchair if she goes grocery shopping or to the mall. *Id*. **at 406-407; 419, 422.** Her husband does the yard work and her daughter helps with the household chores. *Id*. **at 422-23.** She spends her days reading, watching television and listening to talk radio and she tries to attend church every week. *Id*. **at 423-24.** She testified that she and her family eat out quite often because she is physically unable to cook the meals. *Id*. **at 425.**

The Plaintiff's husband also testified during the hearing. *Id*. **at 436.** He testified that after she quit the newspaper job, her physical condition deteriorated; that she is no longer capable of doing household chores such as cooking, cleaning, and laundry, and that she suffers from pain in her feet, legs and arms. *Id*. **at 437-38.**

A vocational expert also testified at the hearing. *Id*. **at 427.** She testified that she was familiar with the vocational information in Plaintiff's record and had been present during the Plaintiff's testimony at the hearing. *Id.* The vocational expert testified that Plaintiff's job as a newspaper

deliverer would be classified as light, unskilled work; and her job as a warp attender would be classified as light, semiskilled work.  *Id*. **at 429.**  The vocational expert testified that Plaintiff had acquired no transferrable skills from her prior employment.  *Id.*

The ALJ posed a hypothetical question to the vocational expert asking her to assume a person was able to engage in sedentary work and able to lift and carry a maximum of 10 pounds, would such a person be able to perform any of the Plaintiff's past work.  *Id*.  The vocational expert answered that such a person would not be able to perform Plaintiff's past work.  *Id*. **at 430.**  Next, the ALJ asked the vocational expert to assume a person age 37 to 40, has two years of college, and past work experience as the Plaintiff's; that such person was able to sit for one hour, stand for 5 minutes, lift the weight of a gallon of water, walk without assistance for 10 feet and with assistance for 20 feet; and avoid extreme heat and direct sunlight, would such person be capable of performing any other sedentary jobs.  *Id.*  The vocational expert testified that such person would be able to perform sedentary skilled and unskilled clerical jobs such as a routing clerk, order clerk, or charge account clerk, and that such jobs existed in significant numbers in North Carolina.  *Id.*

In response to questions posed by Plaintiff's counsel, the vocational expert testified that if a person must walk about every 20 minutes for five minutes throughout the workday, if their impairments caused them to miss three days of work per month, if they experienced difficulty relating to fellow workers or supervisors, and if their intolerance to stress associated with work routine significantly interfered with their work performance, then these factors "could cause problems" in that person maintaining employment.  ***Id*. at 432-33.**  Additionally, counsel asked the vocational expert if the ALJ found the Plaintiff's testimony to be totally credible and all of her impairments were supported by the medical evidence, would there be any jobs she would be able to perform.  ***Id*. at 435.**  The vocational expert testified that there would be no jobs she could perform.  ***Id*.**

**B.     Medical records**

Dr. Michael Ribadeneyra, an internist with Shelby Medical Associates, is the Plaintiff's primary care physician.  The record contains reports from Dr. Ribadeneyra for the period April 25, 2003, to June 14, 2007.  During her April 25, 2003, visit, the Plaintiff complained that her menses were increasing in length and severity, that they often lasted two

weeks, and left her feeling fatigued as a result.  *Id*. at 265.  She also

reported a history of lupus, but had not been prescribed any medication for

that condition.  *Id*.  Dr. Ribadeneyra diagnosed the Plaintiff as suffering

from menometrorrhagia[1] and fatigue, along with quiescent lupus and mild

intermittent asthma.  *Id*.  He also performed complete blood studies,

chemical panels, and EKG; he prescribed Ortho-Evra patch to control her

heavy menses.  *Id*.  By the August 7, 2003, her heavy periods had slowed,

but Dr. Ribadeneyra suspected that the Ortho-Evra patches may have

caused a severe skin rash and it was discontinued.  *Id*. at 272.  Dr.

Ribadeneyra also reported the rash may have been due to Plaintiff's lupus

and he continued the Plaquenil and Prednisone medications as Plaintiff

reported less joint pain when taking those medications.  *Id*.

On referral from Dr. Ribadeneyra, Plaintiff was seen by Dr. P. Brent

Ferrell, an internist and rheumatologist with Shelby Medical Associates on

October 13, 2003.  *Id*. at 275.  Dr. Ferrell recounts in great detail the

Plaintiff's medical history from approximately 1999.  He also performed a

---

[1] "Excessive uterine bleeding occurring both during the menses and at irregular intervals."  ***Dorland's Illustrated Medical Dictionary,*** at 1013 (28th ed.).

complete physical examination and laboratory studies.  His impression was

as follows:

> This is a 36 year old woman who had fairly classic onset of
> multisystemic disease consistent with [systemic lupus
> erythematosus][2] 3 years ago.  She has had a relatively mild
> course characterized primarily by hair fall, arthralgias, dry eyes
> and fatigue.  At the present time, she has little in the way of
> active disease and I believe would tolerate a lower dose of
> prednisone.  Given her morbid obesity, certainly discontinuation
> of prednisone long term would be an appropriate goal.

*Id.* at 280 (footnote aded).

For the remainder of 2003 and into 2004, Plaintiff continued to be

treated for lupus by Dr. Ribadeneyra.  In May 2004, Dr. Ribadeneyra wrote

a letter on Plaintiff's behalf regarding her application for disability:

> As [Plaintiff's] primary care physician, I treat [her] for systemic
> lupus erythematosus.  As you may know, this is a relapsing and
> remitting condition that requires lifelong therapy.  At present,
> [Plaintiff's] symptoms are poorly controlled and as such she is
> unable to perform in any gainful occupation of any kind.

---

[2] "A chronic, remitting, relapsing, inflammatory, and often febrile
multisystemic disorder of connective tissue, acute or insidious in onset,
characterized principally by involvement of the skin, joints, kidneys, and
serosal membranes.  It is of unknown etiology, but it is thought to represent
a failure of the regulatory mechanisms of the autoimmune system that
sustain self-tolerance and prevent the body from attacking its own cells . . .
.  The disorder is marked by a wide variety of abnormalities, including
arthritis and arthralgias, nephritis, cental nervous system manifestations,
pleurisy [and] pericarditis[.]" ***Dorland's, supra*, at 964.**

*Id*. **at 288.**

In June 2004, Dr. Ribadeneyra referred the Plaintiff for an MRI.  *Id*. **at 289-90.**  The report disclosed that at the C4-5, there was "moderate left of center posterolateral disc bulge . . . resulting in moderate thecal sac deformity and moderate left C4-5 neural foraminal narrowing."  *Id*. **at 289.** As a result Dr. Ribadeneyra referred the Plaintiff to Dr. Joe D.  Bernard, neurosurgeon.  Dr. Bernard reviewed the MRI and performed an examination of Plaintiff's back and spine.  *Id*. **at 258.**  Dr. Bernard diagnosed Plaintiff as suffering from cervical spondylosis[3] at C4-C5 with a disc bulge on the left side.  *Id*. **at 259.**  Dr. Bernard was of the opinion that the Plaintiff's condition should be treated with conservative therapy inasmuch as Plaintiff's "symptoms are essentially gone at this point."  *Id*.

On January 11, 2005, the Plaintiff was seen in consultation by John H. Bevis, M.A., L.P.A., for a psychological examination.  *Id*. **at 297-300.** Dr. Bevis found Plaintiff was suffering from depression (secondary to her medical condition) and systemic lupus erythematosus and concluded:

---

[3] "Degenerative joint disease affecting the cervical vertebrae, intervertebral disks, and surrounding ligaments and connective tissue[.]" *Dorland's, supra*, **at 1564.**

> [Plaintiff] appears to be functioning within the average range of
> intelligence[,] . . . capable of understanding and following
> simple instructions[,] . . . [able] to perform simple repetitive
> tasks for shorter periods of time [but] will experience problems
> relating to fellow workers and supervisors on a daily basis due
> to her depression and chronic pain.  Her tolerance for stress
> and pressure associated with a work routine will significantly
> interfere with her work performance [but] appears to be capable
> of managing her personal, financial, and business affairs
> without assistance.

*Id*. at 299.

On January 15, 2005, Plaintiff underwent a physical examination by Dr. Shirley D. Ocloo.  *Id*. at 301-09.  Dr. Ocloo found Plaintiff to be taking a variety of medications to combat her systemic lupus disease as well as her chronic asthma.  *Id*. at 302.  Dr. Ocloo also described Plaintiff as being obese, but with  normal coordination, station, and gait "without assistive devices."  *Id*.  Dr. Ocloo diagnosed the Plaintiff as suffering from systemic lupus erythematosus and asthma and evaluated Plaintiff's functional abilities by stating that Plaintiff has "had to give up her . . . job[s] because of the chronic weakness and fatigue as well as joint pains she feels from her lupus."  *Id*. at 303.

In February and April 2005, mental and physical residual functional capacity evaluations were completed by consultative physicians.  *Id*. at 184-201 (mental RFC); 202-09 (physical RFC).  Based on his review of

Plaintiff's medical records, W. W. Albertson, Ed.D., opined that although the Plaintiff suffered from depression as a result of her medical condition, she was capable of performing simple routine, repetitive tasks in a low stress environment. *Id*. **at 186, 191.** Dr. Albertson noted that the Plaintiff was only moderately limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; that she was moderately limited in her ability to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, and to set realistic goals or make plans independently of others. *Id*. **at 184-85.** Dr. Albertson also stated that the Plaintiff was mildly restricted in the activities of daily living and in maintaining social functioning, but that she was moderately limited in her ability to maintain concentration and persistence of pace. *Id*. **at 198.**

Dr. Robert Pyle performed the physical residual functional assessment in April 2005 based on his review of the Plaintiff's medical records. *Id*. **at 202-09.** It was Dr. Pyle's opinion that the Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently; that she

could stand and/or walk and sit (with normal breaks) about 6 hours out of an 8-hour workday; that she was unlimited in her ability to push/pull; that she had no limitations in her ability to climb, balance, stoop, kneel, crouch, or crawl; she had no manipulative, visual, or communicative restrictions; and the only environmental limitation he acknowledged was that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and areas with poor ventilation. *Id.* at 203-06.

Dr. Ribadeneyra's medical reports from August 2004 to May 2007, show that he continued to treat Plaintiff's systemic lupus erythematosus, recurrent periods of erythema nodosum,[4] menometrorrhagia, and depression with a variety of medications. *Id.* at 291-96, 310-34. Plaintiff responded in varying degrees to the medication regimen; during this period, Plaintiff reported improvement in some of her symptoms and worsening of others. During this period, however, Dr. Ribadeneyra's opinion that Plaintiff was disabled did not change. *Id.* at 310-31.

---

[4] "Redness of the skin produced by congestion of the capillaries, which may result from a variety of causes . . . [including] a hypersensitivity reaction to . . . drugs, especially oral contraceptives[.] . . . [It] is characterized by the development of crops of transient, inflammatory, nonulcerating nodules that are usually tender, multiple, and bilateral, and most commonly located on the shins; the lesions involute slowly, leaving bruiselike patches without scarring. *Dorland's, supra*, at 576.

On July 9, 2007, Dr. Ribadeneyra assessed Plaintiff's ability to perform work related activities. *Id*. **at 363.** It was his opinion that she could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; she could stand and walk (with normal breaks) about 2 hours in an 8-hour workday and sit (with normal breaks) about 4 hours in an 8-hour workday; that she could sit 30 minutes without changing position, stand for 10 minutes before changing position, must walk around every 20 minutes for about 5 minutes in duration; and that she needed the opportunity to shift at will from a position of sitting to that of standing/walking. *Id*. **at 363-64.** He stated that his medical findings that the Plaintiff suffered from systemic lupus erythematosus, cervical disc disease, morbid obesity, and asthma supported those limitations. *Id*. **at 364.** He opined that Plaintiff's pain, her decreased range of motion, and joint swelling prohibited her from twisting, crouching, or climbing ladders, and that she could only occasionally bend and climb stairs. *Id*. He also stated that these symptoms also limited Plaintiff's ability to reach overhead, to do fine manipulation, and pushing/pulling. *Id*. He noted the Plaintiff should avoid extreme heat or cold due to the fact that these factors exacerbated her joint symptoms and affected her treatment medications; that she should

avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation as these could promote asthma attacks; and her chronic use of prednisone for treatment of lupus "suggests" avoidance of hazards. *Id.* Dr. Ribadeneyra also opined that Plaintiff's impairments would cause her to miss work more than three times per month. *Id.* **at 365.**

On May 15, 2007, Dr. Thomas R. Davis performed a "hysteroscopic dilatation and currettage" for removal of the Plaintiff's ovarian cyst and fibroids. *Id.* **at 351.** She tolerated the procedure well; Dr. Ribadeneyra's notes of June 14, 2007, indicate that the surgery for treatment of Plaintiff's menorrhagia resulted in the Plaintiff not having to take "birth control pills since [the surgery]." *Id.* **at 380.**

The record also contains medical reports from Dr. Cheryl R. Robertson of the Carolinas Arthritis Center. *Id.* **at 224-42 (June 2000-October 2001); 382-96.** Of particular relevance to this inquiry are Dr. Robertson's reports of May through July 2007. *Id.* **at 383-89.** Plaintiff was examined by Dr. Robertson on May 7, 2007, where Dr. Robertson expressed particular concern regarding the Plaintiff's continued use of prednisone to treat her lupus condition. *Id.* **at 385.** In her notes of June 15, 2007, Dr. Robertson listed 17 separate "problems" Plaintiff was

suffering from and 14 current medications Plaintiff was taking to address those medical conditions. *Id*. **at 386.** On this date, Dr. Robertson introduced the medication Imuran as an eventual substitute for the prednisone Plaintiff was taking for her lupus condition. *Id*. **at 387.** The last report from Dr. Robertson contained in the record is dated July 27, 2007, and shows that the Plaintiff was tolerating the Imuran well and Dr. Robertson reduced the dosage of prednisone as a result thereof. *Id*. **at 388-89.**

## IV.  DISCUSSION

Disability under the Social Security Act means the inability to engage in any substantial gainful activity due to a physical or mental impairment expected to result in death or to last for a continuous period of not less than twelve months. In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. ***See,* 20 C.F.R. § 416.920.** If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. ***Pass v. Chater*, 65 F.3d 1200, 1203 (4ᵗʰ Cir. 1995).**

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education,

or work experience of the applicant. *Id.* Second, the applicant must show a severe impairment. If the applicant does not show any impairment or combination thereof which significantly limits the physical or mental ability to perform work activities, then no severe impairment is shown and the applicant is not disabled. *Id.* Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the applicant is disabled regardless of age, education or work experience. *Id.* Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. *Id.* Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work. If so, then the claimant is not disabled. *Id.* In this case, the ALJ's determination was made at the fifth step. Although "the claimant was unable to perform her past relevant work . . . through the date last insured, considering [her] age, education, work experience, and residual functional capacity, there were jobs that

existed in significant numbers in the national economy that [she] could have performed[.]" **Tr. at 24-25.** The ALJ, therefore, found that the "claimant was not under a disability as defined in the Social Security Act, at any time from May 7, 2004, the alleged onset date, through March 31, 2007, the date last insured[.]" *Id.* **at 26 (citing 20 C.F.R. § 404.1520(g)).**

"The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step." ***Burch v. Apfel*, 9 F. App'x 255, 257 (4ᵗʰ Cir. 2001) (citing *Pass v. Chater*, 65 F.3d 1200).** As noted, Plaintiff carried her burden of proof on the first four steps and the ALJ so found by proceeding to the fifth step where the burden then shifted to the Commissioner. "In questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." ***English v. Shalala*, 10 F.3d 1080, 1085 (4ᵗʰ Cir. 1993).** These questions must fairly set forth all of the claimant's impairments. ***Walker v. Bowen*, 889 F.2d 47, 50 (4ᵗʰ Cir. 1989).** It can hardly be claimed that a prospective employer would look with favor on a prospective employee whose height is 5'4" and weight fluctuates from 250 to 300 pounds. There are references in the record of

advice to Plaintiff from her treatment physicians that she should lose weight.  However, "absent evidence that claimant's weight was within her control, claimant's failure to lose weight upon physicians' recommendations did not preclude claimant from receiving disability benefits."  ***Lucas v. Sullivan***, **918 F.2d 1567, 1574 (11ᵗʰ Cir. 1990) (citing *McCall v. Bowen*, 846 F.2d 1317, 1319 (11ᵗʰ Cir. 1988)).**  It is also worth noting that Plaintiff, of necessity, took prednisone continuously to control her lupus which resulted in significant weight gain.

The Court finds that the hypothetical posed by the ALJ to the vocational expert is defective in that there is no mention of the Plaintiff's morbid obesity and the significant limitations in her abilities to balance, stand, stoop, bend, and walk as identified by her treating physician.  Nor does the hypothetical comply with the observations and requirements specifically dealing with morbid obesity as set forth in the policy interpretation ruling SSR 02-1P issued September 12, 2002.  This ruling recognized obesity as "a complex, chronic disease."  ***See* SSR 02-1P, 2000 WL 628049 (S.S.A.).**  Every examining physician referenced her obesity.  The ruling recognized three levels of obesity and the manner in which the disease will be evaluated for determining disability or its effect on

functional capacity.  The ALJ's hypothetical simply ignores the evidence of her treating physician that the severity of her pain would limit her ability to perform any sedentary or light activities at all.

The ALJ failed to fully credit the findings by Plaintiff's treating physician contained in the record as to her physical and mental problems resulting from lupus, asthma, depression, joint pain, variety of prescribed medication, and extreme obesity as well as other exertional limitations despite the general rule that "courts typically 'accord greater weight to the testimony of a treating physician because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant.'"  ***Hines v. Barnhart*, 453 F.3d 559, 563 (4ᵗʰ Cir. 2006) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 654 (4ᵗʰ Cir. 2005)) (other citations omitted); *see also* 20 C.F.R. § 404.1527(d).**  In this case, Dr. Ribadeneyra had been treating and following Plaintiff for a number of years.

The ALJ also failed to properly credit Plaintiff's own testimony concerning the severity and disabling nature of the pain she had suffered for a number of years.  In short, as observed in *Hines*, subjective evidence of pain must be properly evaluated.  "'[T]he adjudicator must evaluate the

disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence.'" *Id.* **at 564 (quoting Social Security Ruling 90-1p);** *see also*, **SSR 96-7p, ¶¶ 3-5.**

This Court concludes that the ALJ's findings are not supported by substantial evidence and the crucial hypothetical question posed to the vocational expert failed to state properly the true physical and mental limitations Plaintiff suffered as of May 7, 2004, the alleged onset date. Thus, the Commissioner failed in carrying "the burden of providing evidence of a significant number of jobs in the national economy that [the] claimant could perform." *Walls v. Barnhart*, **296 F.3d 287, 290 (4ᵗʰ Cir. 2002) (citing** *Powers v. Apfel*, **207 F.3d 431, 436 (7ᵗʰ Cir. 2000)) (other citations omitted).**

For the foregoing reasons, the Commissioner's decision denying disability benefits to the Plaintiff is reversed and this matter will be remanded to the Commissioner for an award of benefits beginning on May 7, 2004.

## V.  ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's motion for summary judgment is hereby **GRANTED** and the Defendant's motion for summary judgment is hereby **DENIED**.  A Judgment reversing the Commissioner's decision and awarding benefits to the Plaintiff is filed herewith.

Signed: March 30, 2009

Lacy H. Thornburg
United States District Judge